**STATE of Missouri, Respondent,**

v.

**Vincent Allen BRIGHT, Appellant.**

**No. 21599.**

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 30, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 13, 1998.

Application for Transfer Denied
March 24, 1998.

---

Andrew A. Schroeder, Asst. Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Daniel W. Follett, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

Appellant was tried by jury for the class B felony of trafficking drugs in the second degree, § 195.223, RSMo Cum.Supp.1993, by bringing into Missouri more than thirty kilograms of a mixture or substance containing marijuana. The jury found Appellant guilty and assessed punishment at fifteen years' imprisonment. The trial court entered judgment per the verdict. This appeal followed.

We first address the second of Appellant's two points relied on; it avers:

"The trial court erred in failing to sustain Appellant's motion to suppress evidence obtained as a result of Appellant's unlawful arrest, because Appellant was denied his right to be free from an unreasonable search and seizure, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution and Article I, sections 10 and 15 of the Missouri Constitution, in that the State failed to carry its burden of proof at the suppression hearing and trial of producing evidence to show by a preponderance of the evidence that probable cause existed for Officer Riggs to make a warrantless arrest."

■ The arrest challenged in the above assignment of error occurred November 30, 1993. Evidence regarding it was presented at a pretrial hearing on a motion to suppress filed by Appellant, and subsequently at trial. In reviewing the trial court's denial of the motion to suppress, we view the facts and reasonable inferences arising therefrom favorably to the trial court's ruling, disregarding contrary evidence and inferences. *State v. Franklin*, 841 S.W.2d 639, 641[1] (Mo. banc 1992).

So viewed, the evidence establishes that about 3:15 p.m., November 30, 1993, Corporal Jack McMullin of the Missouri State Highway Patrol was eastbound on Interstate Highway 44 ("I–44") in Greene County, traveling at the speed limit: fifty-five miles per hour. An eastbound Chevrolet displaying a Texas license passed him. He "paced" the Chevrolet at "sixty-five," then stopped it for speeding near the intersection of Glenstone and I–44 in Springfield.

The Chevrolet was occupied by two women. The driver was Amy Marie Guajardo. The passenger was Caramel Calway.

McMullin[1] asked Guajardo for her driver's license and the "registration" on the Chevrolet. Guajardo had no driver's license, but she and Calway produced a "rental agreement" for the Chevrolet.

McMullin directed Guajardo to go to his vehicle. There, he received information via radio that Guajardo's driver's license was "suspended in California." He issued her a summons for "no valid driver's license."

The rental agreement showed the Chevrolet was "an Alamo rental car" from Texas. The name on the agreement was Cornelius Williams.

Guajardo informed McMullin that she was living in El Paso, and that she and Calway were following her brother in another car. According to McMullin, Guajardo explained they were "following him up [to Detroit] so he could take that car up there, drop it off, then they were going to go back to El Paso in the car that she was driving."

Guajardo described the vehicle she was following as "a small brown car." Prior to stopping the Chevrolet, McMullin had observed a small Buick "with Michigan plates on it."

As McMullin's conversation with Guajardo progressed, she said the man in the other vehicle was her half brother. McMullin also recalled this:

"[S]he had given me ... a name that I don't remember being that of Cornelius Williams, who she described as her brother in the car."

Leaving Guajardo in his vehicle, McMullin walked to the Chevrolet and asked Calway whether she had a driver's license. She had none. McMullin noticed Calway was "very nervous."

Returning to his vehicle, McMullin asked Guajardo whether she and Calway had any luggage. Guajardo replied that her brother had put a bag in the trunk. That struck McMullin as unusual because "they were in a car of their own ... [w]hy would they ... put baggage in the back of their car."

By this time, McMullin was suspicious that the Chevrolet was carrying drugs. He explained:

---

1. For brevity and clarity, we refer to the people mentioned in this opinion by their respective surnames. We mean no disrespect.

"The car ... being rented in another individual's name ... they were coming out of El Paso, going up to Detroit.... El Paso is a border crossing point, drug source city, major drug source city.... [Detroit is] a ... major drug reception city.... A lot of times couriers will carry narcotics in vehicles rented by someone else.... Guajardo first said the subject they were following was her brother, and then backed off to being a half brother."

McMullin asked Guajardo for permission to search the Chevrolet. She consented. At that point, less than ten minutes had elapsed since the stop.

McMullin and Guajardo went to the Chevrolet. Guajardo opened the trunk. McMullin "smelled the odor of marijuana." Three bags in the trunk contained bundles of marijuana. In all, there were twenty-eight bundles weighing, in the aggregate, about eighty-five pounds.

McMullin arrested Guajardo and Calway.

While still at the roadside, McMullin informed his troop headquarters by radio about the arrests and asked that the eastbound Buick be stopped.

During the time those events were occurring, Corporal Gary W. Riggs of the Missouri State Highway Patrol — the officer mentioned in Appellant's second point — was on duty in a "marked patrol car" in the "Marshfield area" of Webster County. Asked where Webster County is situated with respect to Greene County, Riggs replied: "It's east of Greene County on Interstate 44[.]"

About 3:30 p.m., Riggs received a "radio dispatch" regarding the "stop" McMullin had made on I–44. Recounting the message, Riggs testified:

"I was advised ... to watch for a maroon in color Buick ... being driven eastbound on I–44. It was to be driven by a black male, and had Michigan plates on the vehicle.... [The dispatcher] advised that ... McMullin had made a traffic stop and narcotics had been found and that this subject was linked to that.... [The dispatcher] stated that the driver should be a Cornelius Williams."

Riggs proceeded to I–44 and "set up in the median, a cross over there near Marshfield."

After an interval estimated by Riggs to be between six and twenty minutes, he saw a Buick bearing "Michigan plates" eastbound on I–44 driven by a black male.[2] The driver appeared to be the only occupant. Riggs "ran the plate" and was advised it was for a rental car.

Riggs began following the Buick but made no immediate attempt to stop it. He explained: "I ... waited a few minutes for a Marshfield police officer to catch up with me for backup."

When the Marshfield officer appeared, Riggs "got behind the [Buick]" and prepared to activate the red lights on his vehicle. At that moment, another person "came up in the back seat" of the Buick.

Riggs activated the red lights; the Buick drove onto the shoulder and stopped. At that point, Riggs had followed the Buick about six miles.

The driver of the Buick identified himself as Cornelius Williams, stated the Buick was a rental car, and produced a rental agreement.

The occupant of the back seat — the only passenger in the Buick — was Appellant. He identified himself as Dennis Earl Bright.[3]

Riggs looked at the rental agreement; it bore the name Cornelius Williams.

Riggs informed troop headquarters that he had the Buick stopped and "two subjects" in custody. The dispatcher told Riggs to arrest both men "for possible drug trafficking." Riggs did so, handcuffing them and advising them of their rights "per the Miranda[4] card."

---

**2.** At the suppression hearing, Riggs testified he saw the Buick about six minutes after receiving the radio dispatch. At trial, he testified he watched eastbound traffic on I–44 "approximately fifteen to twenty minutes" after the dispatch before observing the Buick.

**3.** Testifying outside the presence of the jury on the suppression motion, Appellant avowed his name is Vincent Allen Bright.

**4.** Inferably, *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appellant and Williams were taken from the arrest site to troop headquarters in Springfield.

Sergeant Miles Parks of the Missouri State Highway Patrol interviewed Calway at troop headquarters after her arrest. At trial, Parks identified Exhibit 1 as a "note" he obtained from Calway.

Calway described Exhibit 1 as "the roads [we] were supposed to [follow], and then this was just in case we got lost, this was the number we were supposed to call."

Although Exhibit 1 has not been filed with us, Parks read it aloud in the presence of the jury. His recitation is footnoted below.[5]

After interviewing Calway, Parks interviewed Guajardo, then Appellant.

Parks asked Appellant whether he recognized Exhibit 1. According to Parks, Appellant responded that "they were his directions from Detroit to El Paso." Parks then asked Appellant whether the handwriting on Exhibit 1 was his. Appellant's reply, according to Parks, was: "[H]e said it was his handwriting. And I think he identified both the front and the back as being his handwriting." However, added Parks, Appellant "said he didn't know JB."

Although Appellant's second point does not identify the evidence which, according to Appellant, the trial court should have suppressed, we glean from the argument following the point that the only evidence toward which the point is directed is "[Appellant's] statement to ... Parks at ... headquarters that the handwriting on the piece of notebook paper ... was his." The State's brief reflects that understanding of Appellant's second point. Accordingly, our discussion of the point is based on the assumption that the point challenges the admissibility of only Appellant's statements to Parks about Exhibit 1.

The version of § 544.216 in force on the date Appellant was arrested is the version in RSMo Cum.Supp.1993. It reads, in pertinent part:

"Any ... member of the Missouri state highway patrol ... may arrest on view, and without a warrant, any person ... who he has reasonable grounds to believe has violated any law of this state, including a misdemeanor.... The power of arrest authorized by this section is in addition to all other powers conferred upon law enforcement officers, and shall not be construed so as to limit or restrict any other power of a law enforcement officer."

The original version of § 544.216 was enacted in 1983. Laws of Missouri 1983, H.C.S.S.B. 72, p. 921. However, even before that a law enforcement officer was authorized to arrest, without a warrant, any person whom he had reasonable cause to believe had committed a felony and anyone committing a misdemeanor in his presence. *Rustici v. Weidemeyer*, 673 S.W.2d 762, 769–70[22] (Mo. banc 1984).

While § 544.216, RSMo Cum.Supp.1993, ostensibly authorized Riggs to arrest Appellant for a felony *or* misdemeanor if Riggs had reasonable grounds to believe Appellant had committed either, we need not concern ourselves with Riggs's authority to arrest for a misdemeanor, as the crime for which he arrested Appellant — trafficking drugs in the second degree — is, as noted in the first sentence of this opinion, a felony.

Appellant maintains that neither Riggs nor McMullin was "aware of any facts warranting a belief that [Appellant] had committed or was committing the offense of trafficking drugs." Appellant asserts Riggs did not even know Appellant was a passenger in the Buick until Appellant arose from the back seat immediately before Riggs activated the red lights to signal Williams to stop the Buick.

 Probable cause for an arrest without a warrant exists when the facts and circumstances within the arresting officers' knowledge and of which they have reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in a belief that an offense has been or

---

5. "On the front side of the document it says going east or north. The next line is 54 to Tucumcari, 40 to Amarillo, 40 to Oklahoma City, 44, St. Louis, 70, Indianapolis, 65 Chicago, 99, Detroit.... On the back it's just got the initials 'JB' and a phone number, 606–2958."

is being committed, and that the person arrested is guilty of that offense. *State v. Olds*, 603 S.W.2d 501, 505[2] (Mo. banc 1980). The determination of whether probable cause exists at the time of arrest is made upon practical considerations of everyday life on which reasonable persons act, not the hindsight of legal technicians. *State v. Heitman*, 589 S.W.2d 249, 253[5] (Mo. banc 1979), *cert. denied*, 446 U.S. 941, 100 S.Ct. 2164, 64 L.Ed.2d 795 (1980).

■ Probable cause is to be determined upon the facts available for consideration by the agencies or officers participating in the arrest. *State v. Adams*, 791 S.W.2d 873, 877[7] (Mo.App. W.D.1990); *State v. Morris*, 662 S.W.2d 884, 892–93[17] (Mo.App. S.D. 1983). The collective knowledge and available facts are the criteria; the arresting officer himself need not possess all of the available information. *Adams*, 791 S.W.2d at 877[7]; *Morris*, 662 S.W.2d at 892–93[18].

■ Here, at the time of Appellant's arrest, McMullin and Riggs knew, collectively: (1) a Chevrolet rented in Texas under the name Cornelius Williams was en route from El Paso to Detroit on I–44, (2) the Chevrolet was carrying twenty-eight bundles of marijuana in the trunk, (3) the marijuana weighed, in the aggregate, about eighty-five pounds, (4) the two occupants of the Chevrolet were women; neither was Cornelius Williams, (5) the Chevrolet's driver, Guajuardo, said the women were following Guajuardo's brother in another car, (6) Guajuardo told McMullin her brother had put a bag in the Chevrolet's trunk, (7) Guajuardo mentioned another name, which McMullin did not remember as Cornelius Williams, as that of her brother, (8) later, Guajuardo said the man she and Calway were following was Guajuardo's half brother, (9) a Buick with Michigan license was eastbound on I–44, ahead of the Chevrolet, (10) the Buick reached Marshfield — some twenty miles east of the site where McMullin stopped the Chevrolet — between twenty-one and thirty-five minutes after McMullin first saw the Chevrolet[6] (11)

the driver of the Buick was Cornelius Williams, (12) the Buick, like the Chevrolet, was rented by Williams, (13) El Paso is a major drug source city, (14) Detroit is a major drug reception city, (15) drug couriers frequently transport drugs in vehicles rented by others, (16) Guajardo's explanation for the journey was that she and Calway were driving the rented Chevrolet from El Paso to Detroit so her brother could take the Buick — which Riggs discovered was also a rented vehicle — to Detroit, then return to El Paso in the Chevrolet, (17) Guajardo offered no reason for using one rented car to return another rented car to such a distant destination.

■ In reviewing a trial court's decision on a motion to suppress evidence, an appellate court determines only whether the evidence is sufficient to support the challenged ruling. *State v. Burkhardt*, 795 S.W.2d 399, 404[6] (Mo. banc 1990). Only if the trial court's ruling is clearly erroneous will the appellate court reverse. *State v. Milliorn*, 794 S.W.2d 181, 183[5] (Mo. banc 1990).

Applying the above standard, we hold a person of reasonable caution could have believed from the seventeen facts enumerated earlier that (a) an individual using the name Cornelius Williams knew the Chevrolet was carrying the marijuana, (b) a man to whom Guajardo referred as her brother, and later as her half brother — the man who put a bag in the Chevrolet's trunk — was in the Buick, (c) the man referred to in clause "b" may be someone other than the individual using the name Cornelius Williams, (d) the man referred to in clause "b" knew the Chevrolet's trunk contained marijuana, as he put one of the bags of marijuana there, and (e) it would be unlikely that only one of the two occupants of the Buick would be involved in the marijuana trafficking, as there would have been little time for the driver of the Buick to pick up a stranger between the site where McMullin first saw the Chevrolet and the site where Riggs first saw the Buick, and it would also be unlikely that an individual in-

**6.** McMullin first saw the Chevrolet about 3:15 p.m. Riggs received the radio dispatch about 3:30. As explained in footnote 2, *supra*, Riggs first saw the Buick six to twenty minutes after the dispatch. McMullin testified he stopped the Chevrolet at the "eighty-one mile marker." Riggs first saw the Buick at "mile marker ... 101."

volved in the trafficking would risk exposing the venture by giving a stranger a ride anywhere along the route from El Paso to Detroit.

We therefore hold probable cause existed for Riggs to arrest Appellant.

We do not ignore Appellant's argument that Riggs was unaware there were two men in the Buick until just before he signaled it to stop. While Riggs saw only the driver when he first spotted the Buick, there was never any assumption by McMullin that the Buick was occupied by only one man. McMullin's testimony:

"Q. ... when you dispatched ahead and asked them to try to stop this [Buick], you led your fellow officers to believe there would only be one man in that car, correct, and it would be Cornelius Williams?

A. I didn't know about it being Cornelius Williams. I didn't even know how many was in the car."

We likewise do not ignore *State v. Jacobs*, 704 S.W.2d 300, 302 (Mo.App. E.D.1986), cited by Appellant for the proposition that: "Mere presence in an automobile operated by one who may be committing an illegal offense is not sufficient to establish probable cause for an arrest." *Jacobs* does not apply here, as the facts known by McMullin and Riggs amounted to far more than Appellant's "mere presence" in the Buick.

The trial court did not clearly err in denying Appellant's motion to suppress. Appellant's second point is without merit.

Appellant's first point reads:

"The trial court erred in overruling Appellant's motion for judgment of acquittal notwithstanding the verdict, or in the alternative for a new trial, and in sentencing Appellant, because the State failed to prove Appellant's guilt beyond a reasonable doubt ... in that the State did not establish that Appellant, acting alone, 'brought' into this State more than 30 kilograms of a substance containing marijuana."

■ In adjudicating this point, we accept as true all evidence favorable to the State, including all favorable inferences drawn therefrom, and we disregard all evidence and inferences to the contrary. *State v. Grim*, 854 S.W.2d 403, 405[1] (Mo. banc 1993), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). Our review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found Appellant guilty beyond a reasonable doubt. *Grim*, 854 S.W.2d at 405. We do not weigh the evidence. *State v. Villa–Perez*, 835 S.W.2d 897, 900[3] (Mo. banc 1992).

■ The State's evidence at trial included testimony by Guajardo and Calway, each of whom had earlier pled guilty and received a five-year sentence with immediate probation. One condition of each's probation was that she testify truthfully.

Guajardo told the jury she was residing with Calway in an El Paso apartment in November 1993. A man Guajardo knew as "Major" asked her whether she "wanted to make a trip for him to earn some cash." She replied yes.

The next day, Major instructed Guajardo by phone to go to a "What–A–Burger." Major informed Guajardo that she and Calway were to drive a car to Detroit and they would be paid $2,000 apiece.

At the What–A–Burger, Guajardo and Calway met Williams and Appellant, but were not told their names. Appellant gave Guajardo Exhibit 1, which had "the interstate numbers written down on it ... the interstates that we were to be taking to ... Detroit." Appellant also handed Guajardo some cash underneath the table. According to Guajardo, the cash was "gas and eating money."

Upon leaving the What–A–Burger, Guajardo and Calway entered the rented Chevrolet. Guajardo explained, "At that time we didn't know who rented the car, but we knew it was one of them[.]" Continuing her narrative, Guajardo testified: "[T]hey told us ... we were going to drive around for a while. They wanted to test us to make sure we were going to be driving ... correctly."

Guajardo drove the Chevrolet around El Paso. Appellant and Williams followed in another car. At one point, Appellant yelled at Guajardo because she "drove through a yellow light." He told her to follow "all the laws and not to speed or anything."

After the driving test, the quartet left El Paso. Guajardo and Calway were in the Chevrolet. Appellant and Williams were in the other car. Guajardo recalled, "[W]e were supposed to be following them[.]"

Asked whether she was told what to do if either car got stopped, Guajardo replied, "They had told us to ... keep going until we got to a gas station and to wait there until we had heard ... from them." Guajardo was also asked whether Appellant gave her any additional instructions. She replied he wrote the "pager number" on Exhibit 1 using her "eyeliner." Guajardo recalled that occurred in Oklahoma when they stopped to eat.

Calway's testimony essentially mirrored Guajardo's. Calway also told the jurors Appellant assured her and Guajardo that "when we got to Detroit they would pay us money."

Calway recalled one occasion during the journey when the vehicle occupied by Appellant and Williams "got pulled over." Calway and Guajardo "went on to the next gas station." Appellant and Williams eventually appeared. Calway asked Appellant what happened. According to her, Appellant responded: "Get away from me. Stay away from the car[.]"

Calway also recalled an incident that occurred while she was driving the Chevrolet. Calway narrated: "It was about 3:00 in the morning. And the roads were real bad and construction and [Appellant] thought I was driving too fast and so he stopped the car."

Calway, like Guajardo, testified Appellant wrote the initials "JB" and the phone number on Exhibit 1. Calway acknowledged the number "was supposed to been used once [we] got to Detroit if [we] had problems."

Section 195.223, RSMo Cum.Supp.1993, the statute Appellant was convicted of violating, reads, in pertinent part:

"7. A person commits the crime of trafficking drugs in the second degree if ... he possesses or has under his control, pur-

chases or attempts to purchase, or *brings into this state* more than thirty kilograms or more of a mixture or substance containing marijuana." (Emphasis supplied.)

The amended information on which Appellant was tried alleged he "brought in to the State of Missouri" more than thirty kilograms of a mixture or substance containing marijuana. Consistent with the amended information, the verdict-directing instruction hypothesized that Appellant "brought into this state more than 30 kilograms of a mixture or substance containing marijuana[.]"

The theory of error in Appellant's first point, as refined in the argument following the point, is: "When the State chooses not to submit a case on the theory that the defendant aided or encouraged others in the commission of the crime, the State accepts the burden of proving the defendant, acting alone, committed the offense." In support of that argument, Appellant cites *State v. Friend*, 936 S.W.2d 824 (Mo.App. S.D.1996). Appellant maintains, "[T]he State failed to satisfy the burden it assumed when it opted to submit the case based on [Appellant's] actions as a principal, because the State presented no evidence that [Appellant], acting alone, brought drugs into this state, or that he otherwise had actual or constructive possession of the drugs recovered from the [Chevrolet]."

Both sides cite *State v. Carson*, 941 S.W.2d 518 (Mo. banc 1997). There, as here, the accused was convicted of violating § 195.223. The principal issue was whether the statute required proof that the accused had a culpable mental state and, if so, what the mental state was. *Id.* at 520.

As we comprehend *Carson*, it held that where an accused is charged with violating § 195.223 by bringing a controlled substance into Missouri, the evidence must support a finding that the accused knew or was aware that the mixture or substance he brought into Missouri contained a controlled substance. *Id.* at 520–22. Evidence showing only that the accused consciously disregarded a substantial and unjustifiable risk that the mixture or substance he brought into Missouri contained a controlled substance is

insufficient to support a conviction under § 195.223. *Id.* at 523[9].

The significance of *Carson* regarding the instant case lies in *Carson's* explanation of the meaning of the phrase "brings into this state." *Carson* says:

> "The legislature ... did not define the phrase 'brings into this state.' Courts therefore consider the words used in a statute in their plain and ordinary meaning, which is found in the dictionary. *City of Dellwood v. Twyford,* 912 S.W.2d 58, 60 (Mo. banc 1995). The term 'bring' means:
>
>> to convey, lead, carry, or cause to come along from one place to another, the direction of movement being toward the place from which the action is being regarded; ... to take or carry along with one; ....
>
> *Webster's Third New International Dictionary* 278 (1976)."

*Carson,* 941 S.W.2d at 521[6].

*Carson* took note of the definition of "possessed" or "possessing a controlled substance" in chapter 195:

> "a person, with the knowledge of the presence and illegal nature of a substance, has actual or constructive possession of the substance. A person has actual possession if he has the substance on his person or within easy reach and convenient control. A person who, although not in actual possession, has the power and the intention at a given time to exercise dominion or control over the substance either directly or through another person or persons is in constructive possession of it. Possession may also be sole or joint. If one person alone has possession of a substance possession is sole. If two or more persons share possession of a substance, possession is joint[.]"

§ 195.010(33), RSMo Cum.Supp.1993; 941 S.W.2d at 521.

*Carson* declared: "The legislature's broad definition of 'possess' in *§ 195.010(33)* includes most acts of 'brings into this state.'" *Id.* at 521.

As we fathom Appellant's argument, he contends (a) he could not have brought the marijuana in the Chevrolet into Missouri without actual or constructive possession of it, (b) proof of constructive possession requires at least evidence that he had access to and control over the Chevrolet, and (c) he had neither access to nor control over the Chevrolet. Appellant points out his name was not on the rental agreement for the Chevrolet (or the Buick), he never occupied the Chevrolet, he had no key to it, and none of his possessions were in it.

Appellant ignores the evidence that he: (1) gave Guajardo Exhibit 1, the highway directions from El Paso to Detroit, (2) handed Guajardo money for gasoline and food, (3) monitored the driving test in El Paso, (4) told Guajardo to follow all traffic laws, (5) wrote "JB" and the phone number on Exhibit 1 for Guajardo and Calway to contact in Detroit if they had problems, (6) told Calway that she and Guajardo would be paid when they reached Detroit, (7) told Calway to stay away from the Buick, and (8) stopped Calway for driving the Chevrolet too fast.

We hold a reasonable juror could find from the above evidence that although Appellant was not an occupant of the Chevrolet when McMullin stopped it, Appellant was in constructive possession of the marijuana in the Chevrolet in that he had the power and intention at that time to exercise dominion or control over the marijuana through Guajardo and Calway.

Appellant's control is demonstrated by the evidence that Guajardo and Calway were driving the route specified by Appellant, using expense money provided by Appellant, heading toward a destination chosen by Appellant, and aware that they would be paid — if at all — only upon reaching that destination. They obviously considered themselves subject to Appellant's control, as they obeyed his directive about waiting at a gas station when the Buick in which Appellant was riding was "pulled over." Appellant's control is further demonstrated by his warning to Calway on one occasion that she was driving too fast, and his admonition to her on another occasion to stay away from the Buick in which he was riding. Indeed, as the State accurately points out: "[W]ith the exception of renting the [Chevrolet], Appellant seemed

to be in charge of the operation to move the drugs from El Paso to Detroit."

Appellant relies on cases where an accused was in a vehicle where drugs were found but there was no evidence connecting the accused with the drugs. Those cases are factually different from the instant case, as the evidence here compellingly demonstrates Appellant had constructive possession of the marijuana in the Chevrolet, as he had the power and intention at all times to exercise dominion or control over the Chevrolet and its occupants, Guajardo and Calway.

Applying the rationale of *Carson* that the General Assembly's definition of constructive possession in § 195.010(33) includes most acts of "brings into this state," 941 S.W.2d at 521, we hold the evidence sufficient to support Appellant's conviction.

His first point is denied.

Judgment affirmed.

GARRISON, P.J., and PREWITT, J., concur.