**STATE of Missouri, Plaintiff–Respondent,**

v.

**Jeremiah E. PITTMAN, Defendant–Appellant.**

No. 26203.

Missouri Court of Appeals, Southern District, Division Two.

July 13, 2005.

Rosalynn Koch, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Leslie E. McNamara, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

JEFFREY W. BATES, Chief Judge.

Jeremiah Pittman ("Defendant") was charged by information with the class C felony of tampering with a witness. *See* § 575.270.[1] Following a jury trial, Defendant was convicted of this offense and sentenced by the trial court to serve four years in prison.[2] Defendant presents two points on appeal. In Point I, Defendant claims the trial court erred in preventing Officer Mark Ringgold ("Ringgold"), the witness allegedly threatened by Defendant, from being cross-examined about arranging Defendant's quick release from jail so he could work as a police informant. In Point II, Defendant claims the trial court erred in denying his motion for a judgment of acquittal because the evidence was insufficient to prove that Defendant was guilty of witness tampering. We affirm the judgment of the trial court. To better facilitate our discussion of the issues, we will address Defendant's points in reverse order.

*Point II—Sufficiency of the Evidence*

In Defendant's second point relied on, he contends the trial court erred in denying his motion for judgment of acquittal filed at the close of the State's evidence. The trial court's denial of the motion was error only if there was insufficient evidence to convict Defendant of the charged offense. *See State v. Bass,* 81 S.W.3d 595, 614 (Mo.App.2002). Here, the State charged Defendant with tampering

1. All references to statutes are to RSMo (2000).

2. The court ordered this sentence to run consecutively to a five-year sentence imposed upon Defendant for committing the class B felony of distribution of a controlled substance. Both terms of imprisonment were imposed by the trial court during a consolidated sentencing hearing.

with a witness in violation of § 575.270.1. This subsection of the statute states:

> A person commits the crime of tampering with a witness if, with purpose to induce a witness or a prospective witness in an official proceeding to disobey a subpoena or other legal process, or to absent himself or avoid subpoena or other legal process, *or to withhold evidence,* information or documents, or to testify falsely, he: (1) Threatens or causes harm to any person or property; or (2) Uses force, threats or deception; or (3) Offers, confers or agrees to confer any benefit, direct or indirect, upon such witness; or (4) Conveys any of the foregoing to another in furtherance of a conspiracy.

In reviewing the sufficiency of the evidence to prove this charge, we only determine whether the State produced substantial evidence from which a reasonable jury could have found Defendant guilty beyond a reasonable doubt. *State v. Bruce,* 53 S.W.3d 195, 198 (Mo.App.2001); *State v. Webber,* 982 S.W.2d 317, 324 (Mo.App. 1998). "Substantial evidence is evidence *from which the trier of fact could reasonably find the issue in harmony with the* verdict." *State v. Gomez,* 863 S.W.2d 652, 655 (Mo.App.1993). It is the jury's function to weigh the evidence and determine issues of witness credibility. *See State v. Rose,* 86 S.W.3d 90, 105 (Mo.App.2002). Therefore, "we accept as true all evidence favorable to the State, including all favorable inferences drawn therefrom, and we disregard all evidence and inferences to the contrary." *State v. Bright,* 963 S.W.2d 423, 429 (Mo.App.1998). We have summarized the evidence presented at trial in accordance with these principles.

In May 2001, Ringgold was working for the Springfield Police Department as an undercover narcotics officer. Ringgold had been given a cell phone to use while working as an undercover officer so persons whom he was investigating for drug offenses would have a way to contact him. On May 31st, Ringgold purchased drugs from Defendant, who was known by the "street name" of Matt.[3] Ringgold paid Defendant $580 for the drugs. After this initial encounter, Ringgold spoke with Defendant two or three more times by telephone.

On September 24, 2002, Ringgold met Elwin Jenkins ("Jenkins") and purchased narcotics from him for $240. During that meeting, Ringgold gave Jenkins his cell phone number so they could arrange future drug transactions. Thereafter, Ringgold spoke with Jenkins five or six times by telephone.

On the 30th or 31st of September, 2002, Ringgold drove to a gas station to purchase more drugs from Jenkins. When Jenkins arrived, he had several passengers in his vehicle. Several persons in Jenkins' car got out and went inside the store. Defendant was one of Jenkins' passengers. When Jenkins came back outside, he approached Ringgold's vehicle. Jenkins stated that one of his friends had said Ringgold "was a snitch with the police department." Ringgold denied the accusation, but Jenkins did not sell Ringgold any drugs that night. Soon after this incident, Ringgold received a threatening telephone call. This was the first such call he had received while working on over 200 narcotics investigations.

At some point, Defendant was arrested and charged with distribution of a controlled substance, based upon his sale of drugs to Ringgold on May 31, 2001. Defendant's preliminary hearing on this charge was set for October 23, 2002.

---

**3.** A street name is a nickname that a person in the drug culture uses to hide his identity.

Ringgold was subpoenaed to testify as a witness against Defendant at this hearing. In order to preserve Ringgold's undercover identity, he was dressed in jeans and a T-shirt. This was the same attire he typically wore during undercover operations. While Ringgold was sitting on a bench outside of the courtroom and waiting to be called as a witness, three individuals approached and sat down on the opposite end of the bench. Ringgold recognized Defendant and Jenkins, but he did not know the third person. Both Defendant and Jenkins accused Ringgold of being "a snitch or informant." Ringgold did not reply to the accusation or disclose that he was actually a police officer. Ringgold was not required to testify because Defendant waived his preliminary hearing. His next court appearance was scheduled for November 1, 2002.

Ringgold left the courthouse at approximately 10:30 a.m. and returned to the narcotics unit office. At about 11:30 a.m., Ringgold received a call on his cell phone while he was in the break room with approximately 10 other police officers. The caller hung up when Ringgold answered, and the caller ID feature of Ringgold's cell phone did not register a number to show who had called.

At 11:51 a.m., Ringgold received a second call. He attached a microcassette recorder to the phone and was able to record a portion of the call, which lasted about 10 seconds. During that short conversation, the caller threatened to put Ringgold "in a f____meat locker."

When Ringgold received a third call a couple of minutes later, he was able to record all of it. During that call, three or four people spoke to Ringgold via a speakerphone. Ringgold was able to identify

Defendant, Jenkins and another individual named Timothy Ruble ("Ruble") by their voices.[4] The tape-recording of this call was admitted in evidence and played for the jury. The conversation lasted about 10 minutes. During this call, the following statements were made to Ringgold:

1. "I'm gonna put your ass in a f____body bag and your gonna meet the grim reaper m____ f____."

2. "[Y]ou better look over your shoulder for real man, I'm not playing with you."

3. "We know where you live now."

4. "[w]hat were you doing in court, snitching, right...."

5. "It's amazing that people call me up, my boy Matt calls me up, tells me he's got this snitch in court, give me your number, but uh yeah, watch yourself."

6. "I'm gonna pick my teeth with your m____f____bones, I swear to God."

7. "Dog you know, whenever you go into court next time ... [a]nd I get my charges dropped, you feel me."

8. "Gonna kill your little family, dog, just like Capone...."

9. "[Y]ou remember white boy walking up there in the gas station, you know what I'm saying, I said you was a snitch...."

10. "Well, I'll just put it like this dog, don't get into your car too quick."

11. "Don't worry m____f____, we're on the way."

Ringgold identified Jenkins as the person who said he would put Ringgold in a body bag and pick his teeth with Ringgold's bones (statements 1 and 6, *supra*). Pittman made the statement that Ringgold

4. Ruble was another individual from whom Ringgold had purchased controlled sub-

stances.

had better look over his shoulder (statement 2, *supra*). Ringgold could not identify who made the other statements listed above.

At the conclusion of the third call, Ringgold made arrangements to have Defendant arrested for tampering with a witness. When Defendant arrived at the police department around 1:30 p.m., he was interviewed by Ringgold after being given a *Miranda* warning and signing a waiver form.[5] Defendant admitted that he participated in the calls, and he prepared and signed a handwritten document which stated:

> I was cooking steaks, and I heard the speaker phone on, so I came in there, and they said it was the informant. So I asked him how much he liked being a snitch and how much he got paid for it. I was mainly just clowning on him. It was a joke, but I did not threaten him.

Ringgold testified, however, that people in the drug culture do not joke about being a snitch. Typically, snitches are threatened with death, and informants are always concerned about their safety when they provide information to the police. During the third phone call, one of the persons on the speakerphone made a reference to his charges being dropped the next time Ringgold went into court.[6] Ringgold described this as a reference to the fact that charges *against a suspect will be dropped if an* informant refuses to testify.

As noted above, the issue for us to decide is whether the State presented substantial evidence from which a reasonable jury could have found Defendant guilty beyond a reasonable doubt of the crime of tampering with a witness. The elements which the jury had to find in order to

return a verdict of guilty were contained in Instruction No. 5, the State's verdict-directing instruction. It is set out in full below:

### INSTRUCTION NO. 5

A person is responsible for his own conduct and he is also responsible for the conduct of other persons in committing an offense if he acts with the other persons with the common purpose of committing that offense or if, for the purpose of committing that offense, he aids or encourages the other persons in committing it.

If you find and believe from the evidence beyond a reasonable doubt:

First, that Officer M. Ringgold was a witness in *State v. Jeremiah Pittman* 302CF8599, and

Second, that such proceeding was an official proceeding, and

Third, that on or about the 23rd day of October, 2002, in the County of Greene, State of Missouri, the defendant and the other person or persons made a telephone call to Officer M. Ringgold where Officer M. Ringgold was told

"I'm gonna put your ass in a f___body bag."

"You better look over your shoulder, for real man, I'm not playing with you"

"I'm gonna pick my teeth with your m___f___bones, I swear to God"

Fourth, that in so doing, the defendant and the other person or persons threatened to kill Officer Ringgold and

Fifth, that the defendant so acted with the purpose to influence M. Ringgold

---

5. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. The speaker stated, "Dog you know, whenever you go into court next time . . . And I get my charges dropped, you feel me."

to withhold information in connection with such official proceeding, and

Sixth, that this official proceeding was a prosecution for a drug felony,

then you are instructed that the offense of tampering with a witness has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Seventh, that with the purpose of promoting or furthering the commission of that tampering with a witness, the defendant acted together with Elwin Tyler Jenkins and other person(s), in committing the offense,

then you will find the defendant guilty of tampering with a witness.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

As used in this instruction, the term "official proceeding" means any cause, matter or proceeding where the laws of this state require that evidence considered therein be under oath or affirmation and includes the felony case *State v. Jeremiah Pittman* 302CF8599.

At trial, Defendant admitted the First, Second and Sixth paragraphs of this instruction, so only paragraphs Third, Fourth, Fifth and Seventh were in dispute.

■ In Defendant's second point on appeal, he challenges the sufficiency of the evidence to prove that he was guilty of witness tampering. Defendant concedes the evidence proved that Ringgold was threatened, but "there was no showing that [Defendant] acted with a common purpose to intimidate the officer and prevent his testimony in a court proceeding." We disagree.

In late September 2002, Defendant was with Jenkins when he first learned that Ringgold might be an informant. Jenkins immediately backed out of a planned drug sale, and Ringgold received his first-ever threatening telephone call shortly afterwards. Jenkins and Defendant both came to the Greene County Courthouse on October 23, 2002. When they saw Ringgold and realized he was there to testify against Defendant, they again accused Ringgold of being a snitch. The series of three threatening phone calls to Ringgold took place within an hour after he left court. He received these calls on the cell phone he used to set up drug deals, and he had given that phone number to Jenkins. The specific threats against Ringgold's life that were submitted in paragraph Third of Instruction No. 5 all took place during the third phone call to Ringgold. Defendant admitted he participated in this call, which was made immediately after Defendant discovered Ringgold was a witness against Defendant in a felony drug possession case. Ringgold had not yet testified, and further proceedings in the case were scheduled to occur nine days later. Defendant and Jenkins both participated in making the threats against Ringgold's life. Defendant was identified as the person who said, "you better look over your shoulder for real man, I'm not playing with you." Jenkins was identified as the person who made the other two statements submitted in paragraph Third. The jury could infer that they did so to induce Ringgold not to testify because: (1) they had both sold drugs to Ringgold; (2) they knew he could testify against each one of them; and (3) they knew charges against a drug suspect could be dismissed if an informant refused to cooperate with the prosecutor.

In sum, the State presented substantial evidence to support each disputed element of Instruction No. 5. Based on that evidence, a reasonable jury could have found beyond a reasonable doubt that Defendant

was guilty of tampering with a witness because he and Jenkins threatened Ringgold for the purpose of intimidating him and thereby dissuading him from testifying against Defendant in his pending criminal trial or against Jenkins in any future criminal proceedings involving him. Defendant's second point is denied.

### Point I—Exclusion of Evidence During Cross-examination

In Defendant's first point on appeal, he claims the trial court erred when it sustained objections to Defendant's proposed cross-examination of Ringgold concerning Defendant's release from jail to work as a confidential informant for the police after being arrested for witness tampering. Defendant argues this line of cross-examination should have been permitted because it was relevant to rebut Ringgold's testimony that he feared for his safety after the phone call from Defendant and to show that Defendant did not intend to threaten Ringgold. The additional facts necessary to understand and decide this point are set forth below.

Prior to trial, the State filed a motion in limine to exclude any references to Defendant's opportunity to work for the police. At the hearing on the motion, Defendant's counsel alleged that Defendant had been released to work as a confidential informant for the police on the same day he had been arrested. Counsel contended such evidence would be relevant to show Ringgold did not take the threats made during the phone calls seriously, which would help the jury determine whether the statements were really intended as threats. The trial court sustained the

State's motion because the judge did not "think the later use of [Defendant] as an informant is going to shed any information at all on his intent at the time the call was made."

During Ringgold's cross-examination, defense counsel asked the trial court to reconsider its ruling on the motion in limine "prohibiting cross-examination and testimony on [Defendant's] release from the jail and later attempt or nonattempt at cooperation with Officer Ringgold." Counsel offered a variety of reasons why he believed such testimony would be relevant.[7] The trial court adhered to its prior ruling because the information defense counsel sought to elicit was neither logically nor legally relevant; it shed no light on what Defendant or the other speakers intended when they made the statements on the tape-recording.

During cross-examination, defense counsel elicited testimony from Ringgold that he laughed when Jenkins said he was going to pick his teeth with Ringgold's bones. On redirect examination, Ringgold testified that he laughed because he did not want to show any fear to the callers or in front of his fellow police officers in the break room. Ringgold explained that "a way for [him] to deal with that fear would be through humor, and that's why [he] would laugh at times."

Prior to re-cross examination, defense counsel approached the bench and asked to impeach Ringgold by showing that he secured Defendant's release from jail. Counsel argued that the State had opened the door to the issue of Ringgold's state of mind by inquiring about Defendant's fear

7. Counsel argued this proposed line of cross-examination was relevant for five reasons: (1) to provide greater context into how serious this threat was; (2) to impeach Ringgold's testimony on direct examination; (3) to elicit testimony that no other threats took place after the telephone calls on October 23rd; (4) to show that Defendant was rearrested because he was not producing, rather than any fear on Ringgold's part; and (5) to rebut the inference that Defendant's immediate arrest occurred because the threat was serious.

during the phone call. The trial court ruled that Ringgold's state of mind was not relevant and stated that he would not permit defense counsel to go beyond the events that actually occurred during the recorded telephone call.

After this ruling, Ringgold was asked a few more questions by the prosecutor and defense counsel. The witness was then excused without defense counsel making any offer of proof concerning the specific testimony he sought to elicit from Ringgold.

Defendant argues that, pursuant to the doctrine of curative admissibility, he should have been permitted to pursue his proposed cross-examination of Ringgold because the State opened the door to the admission of this testimony. This point fails because Defendant failed to make an offer of proof concerning the evidence he claims the trial court erroneously excluded.

■ When a trial court sustains an objection to proffered evidence, the party offering the evidence must demonstrate its relevancy and materiality by way of an offer of proof to preserve the matter for appellate review. *State v. Hall*, 117 S.W.3d 744, 752 (Mo.App.2003); *State v. Dodd*, 10 S.W.3d 546, 556 (Mo.App.1999). The offer of proof must state facts that are specific and sufficiently detailed to establish the admissibility of the evidence sought to be introduced. *State v. Hunter*, 957 S.W.2d 467, 470 (Mo.App.1997). Mere statements and conclusions of counsel are insufficient. *State v. Hurtt*, 836 S.W.2d 56, 59 (Mo.App.1992). "The preferred method of making an offer of proof is to question the witness on the stand out of the jury's hearing." *Dodd*, 10 S.W.3d at 556; *see Hunter*, 957 S.W.2d at 470. In the absence of an offer of proof, we have no way of knowing exactly what testimony defense counsel intended to elicit from Ringgold.

An appellate court is not able to determine the legal issue of admissibility without knowing "exactly what evidence was excluded." *State v. Pisciotta*, 968 S.W.2d 185, 189 (Mo.App.1998); *see Hall*, 117 S.W.3d at 752. Defendant's first point is denied because the issue it presents is not preserved for appellate review. *State v. Kinder*, 942 S.W.2d 313, 329 (Mo. banc 1996); *State v. Harris*, 870 S.W.2d 798, 809 (Mo. banc 1994).

The judgment of the trial court is affirmed.

PARRISH, P.J., and SHRUM, J., concur.